UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| GATOR WACCAMAW SHOPPING CENTER, LTD. And GATOR DEVELOPMENT, INC.<br><br>Plaintiffs,<br><br>v.<br><br>THE HARTFORD FIRE INSURANCE COMPANY,<br><br>Defendant. | CIVIL ACTION NUMBER:  4:09-cv-00393-TLW<br><br><br>**DEFENDANT'S<br>MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rules 7.01 and 7.05 D.S.C, Hartford Fire Insurance Company ("Hartford" or "Defendant") moves for summary judgment as to the interpretation of the property insurance policy applicable to the claim underlying this lawsuit.  The interpretation of certain policy provisions is material to the issues to be tried in this case.  Additionally, Hartford moves for summary judgment on Plaintiffs' bad faith claim.

## Statement of Undisputed Facts

Hartford issued a commercial property policy to Plaintiffs, identified as policy number 83 UUN IU0432 ("Policy") insuring Plaintiffs' 84,468 square foot strip shopping center located in Conway, South Carolina constructed in the 1970s.  The Policy provides Building Property coverage in the amount of $5,000,000, plus $364,931 by virtue of an inflation guard provision.[1] The Policy also provides for $1,000,000 of coverage for losses occasioned by the enforcement of

---

[1] Policy, attached as Exhibit 1, Building Limit page Hartford 08512, inflation guard page Hartford 08213.

an Ordinance or Law.[2]  Hartford has paid $4,723,197 to the Plaintiffs for the Subject Property

under the Policy.[3]  Of this total amount, $2,297,923.70 is for the value of undamaged buildings;

$1,106,659 is for the value of the damaged portion of the building; $867,365 is for increased

costs of construction; $132,635 is for demolition of the undamaged portion of the building; and

the remainder is for demolition of the damaged portion of the building as well as miscellaneous

extra expenses.

On May 28, 2008 a fire damaged the front canopy of a portion of the strip shopping

center.  The anchor tenant space, a Big Lots store, was not damaged and has remained

operational since the fire.[4]  The Big Lots space comprises nearly half of the square footage of the

total insured building.  The remainder of the building (47,000 square feet), is the sole portion of

the building at issue in this case ("Subject Property").[5] Although the cause of the fire was never

officially determined, the fire appeared to have started in the front canopy overhang covering the

exterior walkway in front of the strip mall.  The fire damage was concentrated in the front

portion of the building, with the canopy overhang sustaining the brunt of the damage.[6]

Hartford retained several consultants to assist in the evaluation of the loss.  Immediately

after the fire, Hartford retained Crawford and Company to provide an initial estimate of the loss.

---

[2] Policy, attached as Exhibit 1, Ordinance or Law Coverage Hartford page 08214-08215.

[3] In addition to the payments for the building property, the Hartford has paid $485,601 to Plaintiffs for lost rents.  This payment comes under a separate limit of insurance for business interruption.  Payment for lost rents and the limits of insurance for the business interruption portion of the policy are not in dispute and therefore are not the subject of this Motion for Summary Judgment.

[4] Picture of Big Lots store after fire, attached as Exhibit 3(a).

[5] Footprint Plan of Property, attached as Exhibit 2.  The largest space on the far right is the Big Lots space not at issue in this case.  The smaller eight tenant spaces to the left of the Big Lots space compromise the 47,000 square feet at issue in this case.

[6] Pictures of the front and rear of the Subject Property after the fire, attached as Exhibit 3(b) and 3(c).  The picture of the front of the shopping center shows the tenant spaces to the left of Big Lots;  while the picture of the rear appears to show the rear of the building excluding the Big Lots store.

TPGL 3178467v1

After a site visit on May 30, 2008, Mr. Chuck Herring of Crawford and Company estimated the loss to be $1,000,000.[7]   Hartford also retained a roof consultant, Allan Kidd with HiMark Roofing, to evaluate the extent of the damage to the roof.  Mr. Kidd visited the scene of the loss, performed an independent evaluation of the conditions, and reported his findings to Hartford, concluding the roof damage was repairable and the undamaged portion of the roof did not need to be replaced.  Hartford hired Ashleigh Weatherly, P.E. of Kyzer & Timmerman, LLC, an engineer, to evaluate the structural condition of the Subject Property.  Mr. Weatherly evaluated the structural integrity of the Subject Property and recommended a methodology to address structural issues and bring the structure into compliance with current building codes.  Hartford also retained a construction consultant, Frank Simones of Young and Associates, to evaluate the building repair costs.[8]  Mr. Simones estimated the cost of repairing the damaged portion of the building to be $1,106,659.[9]  Based upon that estimate, Hartford made an undisputed payment of $1,029,859 representing the actual cash value ("ACV") of the damaged portion of the Subject Property.[10]

Rather than commence repairs, Plaintiffs launched a campaign to convince Hartford that it should pay for the Subject Property to be torn down and rebuilt with new construction. Plaintiffs' initial position was to attempt to demonstrate that the cost of new construction would

---

[7] Crawford and Company report, attached as Exhibit 4.  Crawford and Company is a world wide provider of claims assistance.  For additional information see www.crawfordandcompany.com.
[8] Young and Associates is a national building damage cost consulting company.  For more information see www.youngonline.com
[9] Letter of August 1, 2008, to Plaintiffs estimating the building restoration cost per Young & Associates Estimate, attached as Exhibit 5.
[10] The Policy provides that losses are paid on an actual cash value basis, unless and until the property is repaired, rebuilt, or replaced, at which time the replacement cost value ("RCV") becomes due.  Section E.1.b of the Policy provides "We will pay on an Actual Cash Value basis until the lost or damaged property is actually repaired, rebuilt or replaced."  (Policy, attached as Exhibit 1, page Hartford 08220).  ACV is simply the RCV minus depreciation.  In other words, ACV is the present value of the property, while RCV is the cost to replace the property.

3

be less than the cost of repair.  To this end, Plaintiffs submitted two estimates: an estimate for new construction of $3,485,677 ($74 per square foot) and a renovation (repair) estimate of $3,807,232 ($81 per square foot).[11]   Hartford and its consultants continued to maintain that the building was repairable.

As the debate progressed, the Subject Property sat dormant with its condition deteriorating, in violation of the terms of the Policy and the Plaintiffs' duty to mitigate.[12]   On September 17, 2008, nearly four months after the loss, the City of Conway notified the insured of its decision to invoke a city ordinance which allows the city building official to order the demolition of a building if the repair cost exceeds 50% of the building's tax value.[13]   The letter from the city building official also noted that "due to the deteriorating condition of the burned section of the building" it was in violation of a city ordinance prohibiting premises from being a "nuisance."[14]   The letter advised Plaintiffs of their right to contest the findings of the city building official, but Plaintiffs did not contest the findings.

Upon receiving notice that the City of Conway had ordered the Subject Property to be demolished, Hartford appropriately amended the scope of its adjustment of the loss from repair to replacement of the Subject Property.  Within one month of the demolition order, in October

---

[11] New Construction Report, attached as Exhibit 6, and Renovation Report, attached as Exhibit 7.

[12] Policy, attached as Exhibit 1, Duty to Protect Property page Hartford 08202.  A property restoration company, Belfor (www.belforusa.com), was on site immediately after the fire to mitigate damages to the Subject Property, however, Plaintiffs fired Belfor after one of Belfor's employees agreed with Hartford that the entire roof did not need to be torn off of the building. (Email from Bill Goldsmith –a principal of Plaintiffs- terminating Belfor, attached as Exhibit 8). Plaintiffs never hired another property restoration company to protect the property.

[13] Horry County tax records value the building at $552,200 (Horry County Tax Record, attached as Exhibit 9.)  The tax value of the land is $576,500, making the total tax value of the building and the land $1,128,700 as cited in the letter from the City of Conway.

[14] September 17, 2008, letter advising Plaintiffs that the Subject Property should be demolished, with Ordinances 5-1-62 and 6-1-4, attached as Exhibit 10.

2008, Hartford made an additional undisputed payment in the amount of $1,265,838 representing the estimated ACV of the undamaged portion of the building to be demolished.[15]

The order of the City requiring demolition of the Subject Property is significant because the Policy at issue in this claim provides specialized coverage for losses sustained pursuant to the enforcement of a law or ordinance.[16]  This coverage is provided in a section of the Policy titled "Ordinance or Law" ("O&L").[17]  The O&L coverage applies to two types of losses caused by the enforcement of an ordinance or law:  1.) Value of Undamaged Buildings and 2.)  Demolition Costs and Increased Cost of Construction (also referred to as "Code Upgrades").[18]  The "Value of Undamaged Buildings" coverage applies to the "value of the undamaged portion of the building that was required to be demolished by the enforcement of building, zoning, or land use ordinance or law."[19]  This coverage is invoked in this case because a portion of the building undamaged by fire was required to be demolished by the City of Conway.  The second provision of the O&L coverage, "Demolition Costs and Increased Costs of Construction," covers:  a.) "the actual cost to demolish the undamaged portion of the covered building. . ." and b.) "the actual increased costs to repair, replace or rebuild the building . . . to the minimum requirements of such ordinance or law."[20]

---

[15] Statement of Loss, attached as Exhibit 11, and Unsworn Declaration of Kim Dodd, attached as Exhibit 12.

[16] Without the purchase of Ordinance or Law coverage by the insured, the Policy clearly excludes this aspect of the loss.  See general exclusion for Ordinance or Law losses, Policy, attached as Exhibit 1, page Hartford 08238, and specific exclusion for Ordinance or Law losses, page Hartford 08241.

[17] Policy Ordinance or Law Coverage, attached as Exhibit 1, page Hartford 08214-8215.  The Policy expressly provides that payments under O&L coverage are not due unless and until costs are incurred due to *enforcement* of an Ordinance or Law.

[18] Policy, attached as Exhibit 1, page Hartford 08214-08215.

[19] Id.

[20] Id.

TPGL 3178467v1

In November 2008, Hartford's consultant estimated that if Plaintiffs rebuilt the Subject Property, the code upgrade costs would be approximately $611,000 ($13 per square foot)[21] At the same time (November 2008) Plaintiffs' estimate of code upgrade costs submitted to Hartford was only $250,000.[22] This discrepancy in estimates is not surprising because the cost for code upgrades is exceedingly difficult to estimate. The Policy recognizes this difficulty by requiring the cost of code upgrades to be actually incurred in the repair, rebuild, or replacement of the insured building in order to be recoverable.

Plaintiffs elected not to rebuild the Subject Property, but instead chose to replace the Subject Property with another property at a different location.[23] In May of 2009, Plaintiffs replaced the Subject Property with a multi-million dollar shopping center in Dallas, Texas ("Replacement Property"). Hartford agreed to pay the RCV of the Subject Property towards the purchase price of the Replacement Property.[24] Because Plaintiffs did not actually rebuild the Subject Property, the RCV was estimated according to the Policy based on the amount it should

---

[21] Letter from Frank Simones/Young & Associates estimating code upgrade costs, attached as Exhibit 13.

[22] Plaintiffs' Proof of Loss, attached as Exhibit 14, estimated code upgrades page Hartford 01452.

[23] Under the Policy an insured may rebuild, repair, or, *in the event of a total loss*, replace its property at a different location. Although this situation was not a total loss due to the survival of nearly half the building (the 37,468 square foot Big Lots space), Hartford in good faith and as an accommodation to the insured allowed the insured to replace the Subject Property with an alternate property rather than insist upon strict application of the Policy terms.

[24] Presumably, Plaintiffs chose to replace the property in May of 2009 in order to accelerate recovery of the RCV. Payment of RCV under the Policy is contingent on Plaintiffs actually repairing, rebuilding, or replacing the property within two years of the date of loss. (Policy, attached as Exhibit 1, page Hartford 08220, section E.1.b.). Therefore, by replacing the property in May of 2009 the Plaintiffs were able to recover RCV, despite the fact that it is now apparent that the Subject Property will be rebuilt (if at all) after the expiration of two years. However, the amount of the loss under the policy is limited to the cost to replace the portion of the subject property which is the basis of this claim.

have cost to replace the Subject Property.[25]  Since Hartford's consultant had estimated the RCV for the Subject Property to be $3,290,000 ($70 per square foot), upon purchase of the Replacement Property in May of 2009, Hartford paid Plaintiffs another undisputed payment in the amount of $987,000 representing the difference between the estimated ACV and RCV for the Subject property, plus payment of the full estimated increased cost of construction due to enforcement of building codes ($611,000), even though these increased costs were not incurred since Plaintiffs purchased a code-compliant replacement building that did not require any code upgrades.[26]

Subsequent to purchasing the Replacement Property in May of 2009, Plaintiffs now assert that they intend to rebuild the Subject Property on the same premises in Conway.  In June of 2009 Plaintiffs produced a design, of sorts, to rebuild the Subject Property on the original footprint and submitted this design to the City of Conway Community Appearance Board ("CAB").  The CAB rejected this design stating that the strip center design violated a city ordinance prohibiting "long monotonous facade design."[27]  Weeks later, in July 2009, Plaintiffs presented an alternate conceptual design for the rebuild of the Subject Property which CAB did approve ("CAB-Approved Design").  The CAB-Approved Design depicts the rebuilt shopping center as a two building "town center" type of construction, which will allegedly foster

---

[25] Policy, attached as Exhibit 1, Replacement Cost Section E, page Hartford 08220.

[26] Statement of Loss, attached as Exhibit 11.  The $1,598,000 paid on 5-01-2009 is comprised of $987,000 for RCV and $611,000 for estimated increased cost of construction.  Subsequently, upon Plaintiffs' documentation of tenant improvements and betterments in one tenant space at the Subject Property- Panda Chinese Restaurant- Hartford paid an additional $121,885 (Statement of Loss, attached as Exhibit 11; and, Estimate of loss in Panda and pictures, attached as Exhibit 15).
Plaintiffs' Replacement Property cost much more than the RCV for the Subject Property, thus the $1,598,000 simply went toward the overall purchase price.  Letter from Plaintiffs' counsel advising that the Replacement Property is code compliant, attached as Exhibit 16.

[27] Transcript of June 10, 2009, CAB meeting, attached as Exhibit 17; and, City of Conway Ordinance §9.2030(g) prohibiting strip mall construction attached as Exhibit 18.

TPGL 3178467v1

connection with and be more aesthetically pleasing from the perspective of a city park located behind the Subject Property.[28]  Even though Plaintiffs had already replaced the Subject Property with the property in Texas, Hartford reviewed the CAB-Approved Design and determined that the increased cost of construction for the new design required by the city code would most likely exceed $611,000.[29]  Hartford promptly tendered an additional $256,365 to the Plaintiff for estimated increased cost of construction due to the application of this ordinance.   Plaintiffs have yet to reconstruct the Subject Property, rather all payments from Hartford toward Plaintiffs' Replacement Property in Texas are simply based on the estimated cost to reconstruct the Subject Property.  Thus, when it appeared that the increased cost of construction at the Subject Property would likely exceed $611,000, Hartford tendered the additional monies to Plaintiffs, representing the remaining limits of the Ordinance or Law coverage.[30]

This motion seeks a legal ruling by the Court interpreting the Ordinance or Law provision as applied to the facts of this case.  Specifically, Hartford asks that the unambiguous policy language limiting the amount of Ordinance or Law coverage applicable to any loss to $1,000,000 be declared applicable to this claim.  Additionally, Hartford asks the court to construe this policy limit to apply both to the "Value of Undamaged Building" subsection and to the "Demolition Costs and Increased Costs of Construction" subsection of the Ordinance or Law coverage.  This

---

[28] Transcript from July 22, 2009, CAB hearing, attached as Exhibit 19; and, CAB Approved Design, attached as Exhibit 20.

[29] It is clear in this situation that the Policy does not cover both the replacement and the repair of the Subject Property.  Hartford paid the additional amount *toward* the replacement cost of the Replacement Property in Texas.  Hartford paid the additional monies after the property had already been replaced as an accommodation to the insured.

[30] In addition to increased costs of construction, the Ordinance or Law Coverage also provides cost for the demolition of the undamaged portion of the building.  Hartford paid a total of $236,848 for incurred demolition costs. Hartford calculated the incurred demolition costs attributable to the undamaged portion of the building to be $132,635, based on the percentage of ACV attributable to the undamaged portion of the building.

8

ruling would allow the fact finder to focus on the relevant issues of amounts due, if any, under the Policy rather than being confused with conflicting positions by the parties as to the proper interpretation of these Policy provisions which is, without question, a legal issue for the Court to resolve.  Finally, the motion asks the court to examine the lack of admissible evidence to support Plaintiffs' "Bad Faith" claim and grant Hartford summary judgment on that claim.

### Summary Judgment Standard

The standard for summary judgment is clear: entry of summary judgment is mandated where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(e).  The moving party has the threshold burden of showing that there is no genuine issue as to any material fact.  Id., Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).    A party opposing a summary judgment motion bears the ultimate burden of demonstrating that there are material facts as to which there is a genuine issue.    White v. Rockingham Radiologist, Ltd., 820 F.2d 98, 101 (4th Cir. 1987).  The burden of the opposing party can be satisfied only by proof of "specific facts," which are developed as a forecast of hard evidence based upon competent documents and testimony.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

A dispute about a material fact is not "genuine" unless the evidence taken as a whole is such that a rational jury could return a verdict for the opposing party.  Matsushita, 475 U.S. at 587; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986).  The opposing party is entitled to all reasonable inferences in its favor, but an inference is reasonable only if it is plausible and the evidence is such that a rational jury, given the entire record, could draw that inference.  Matsushita, 475 U.S. at 587-88, 593.  Thus, the determinative inquiry is whether the

TPGL 3178467v1

evidence is in sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.  Anderson, 477 U.S. at 248, 250-52.

The construction of a clear and unambiguous contract is a question of law for the court.  Buice v. WMA Securities, Inc., 380 S.C. 149, 155 668 S.E.2d 430, 433 (SC Ct. App.  2008).  As the South Carolina Court of Appeals explained in Buice:

> It is a question of law for the court whether the language of a contract is ambiguous. Because an arbitration clause is a contractual term, general rules of contract interpretation apply where the court must determine the clause's applicability. In determining as a matter of law whether a contract is ambiguous, the court must consider the contract as a whole, rather than deciding whether phrases in isolation could be interpreted in various ways: One may not, by pointing out a single sentence or clause, create an ambiguity.  Whether a contract is ambiguous is to be determined from the entire contract and not from isolated portions of the contract.  Further, in determining the intent of the contracting parties, the court should construe the contract as a whole, and read together different provisions dealing with the same subject matter

(internal citations omitted)  Id, at 156-157, 434.  Accordingly, interpretation of a contract is a matter of law solely within the purview of the court and is appropriate for a ruling on summary judgment.

## DISCUSSION

**1.  The Limit of Insurance for Ordinance or Law Coverage is $1,000,000.**

The Policy covers several different premises owned by the Plaintiffs.[31]  Each of the premises has its own applicable limits of insurance for Building Property, depending upon the value of the Building, and all premises are subject to a $1,000,000 limit for Ordinance or Law Coverage.  The Policy clearly and unambiguously provides coverage for losses incurred by virtue of the enforcement of an ordinance or law *only* under the Ordinance or Law Additional

---

[31] The Plaintiffs own shopping malls across the United States.  See www.gatorinvestments.com.

TPGL 3178467v1

Coverage. This coverage is considered "additional" because it is expressly excluded throughout the Policy, but then added back in by this provision.[32]

To determine how the Ordinance or Law Additional Coverage Type is distinct from the Building Property Coverage it is helpful to examine how the Policy is constructed. The Policy provides coverage for Building Property ("Building Property Coverage"). The Building Property Coverage is set apart in its own Form, entitled PC 00 10 01 03. The Building Property Coverage

---

[32] Coverage for losses sustained by virtue of the enforcement of an Ordinance or Law are clearly excluded by both the general and specific exclusions of the Property Coverage Form. The General Exclusion (pertinent portion) (Hartford 8238):

> We will not pay for loss or damage caused by, resulting from, or arising out of any acts, errors, or omissions by you or others in any of the following activities, regardless of any other cause or event that contributes concurrently, or in any sequence to the loss or damage:
>
> 2. Establishing or enforcement any building code, or any standard, ordinance or law about the construction, use or repair of any property or materials, or requiring the tearing down of any property, including the removal of its debris. . . ."

Specific Exclusion (Hartford 8238):

a. We will not pay for loss or damage caused by, resulting from, or arising out of the enforcement of any      ordinance or law:
(1) Regulating the construction, use or repair of any property; or
(2) *Requiring the tearing down of any property, including the cost of removing its debris.*

b. This Exclusion applies whether the loss results from:

(1) An ordinance or law this is enforce even if the property has not been damaged; or
(2) The increased costs incurred to comply with an ordinance or law while in the course of construction,      repair, or renovation, remodeling, or demolition of property, or removal of its debris, following a physical      loss to that property.

c. This exclusion applies whether or not the loss even results in widespread damage or effects a substantial area.

(emphasis added)

has four parts, Part A. Coverage; Part B. Exclusions; Part C Limits of Insurance; Part D Deductible; and Part E Loss Payment and Valuation Conditions.  As the title suggests, Part A defines Building Property Coverage offered in the Policy.  Subsection 4 of the Building Property Coverage sets forth over 30 types of "Additional Coverages," that cover losses not otherwise covered in the basic Building Property Coverage, one of which is "Ordinance or Law"[33] coverage.

Subsection (4) of the Ordinance or Law Additional Coverage sets forth the Limits of Insurance for the Ordinance or Law Coverage and provides in pertinent part:[34]

**(4)  Limits of Insurance:**

(a)   For Building property, the most we will pay in one occurrence *as respects this Additional Coverage* at a "Scheduled Premises" is the applicable Ordinance and Law – Demolition Cost and Increased Cost of Construction Limit of Insurance stated in the Property Choice Declarations.

(emphasis added).   Pursuant to the express language of the Policy, The Limit of Insurance available for Additional Coverage type "Ordinance or Law" is $1,000,000.[35]  As clearly set forth

---

[33] Policy, attached as Exhibit 1, page Hartford 08208 – 08219.

[34] Policy, attached as Exhibit 1, page Hartford 08215.

[35] The Limit of Insurance for Ordinance or Law is  initially set forth in the scheduled limits on page Hartford 08490, but is amended to be $1,000,000 by an endorsement found on page Hartford 08271.  The Endorsement provides as follows:

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY

AMENDATORY ENDORSEMENT

THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:

COMMERCIAL PROPERTY COVERAGE PART

THE ORDINANCE OR LAW COVERAGE (DEMOLITION & INCREASED COST OF CONSTRUCTION) IS AMENDED TO A BLANKET LIMIT OF INSURANCE OF $1,000,000 APPLYING TO ALL SCHEDULED PREMISES.

TPGL 3178467v1

in the Policy, Ordinance or Law Additional Coverage includes both 1) Value of the Undamaged Building and 2) Demolition Costs and Increased Costs of Construction.

The first type of O&L coverage, "Value of the Undamaged Buildings," simply provides that Hartford will pay for "the value of the undamaged portion of the building that was required to be demolished by the enforcement of building, zoning, or land use ordinance or law."[36]  The pertinent portion of the Ordinance or Law provision provides:

### (1) Value of the Undamaged Buildings

We will pay for the value of the undamaged portion of the building that was required to be demolished by the enforcement of building, zoning or land use ordinance or law.  We will do this on the same valuation basis that applies to the entire building.  This does not include any increased costs to repair, replace or rebuild the property due to enforcement of any ordinance or law.[37]

This additional coverage is included in within the Limit of Insurance applicable to the damaged Building or damaged "Tenant Improvements and Betterments."

In the instant case, only the front portion of the Subject Property was damaged by the fire to the front canopy.  While the damaged portion of the building was repairable, the local code made demolition of the entire structure (excluding Big Lots) necessary.  Therefore, this Additional Coverage covers, up to the limit of insurance for Ordinance or Law coverage, the costs to rebuild the undamaged rear portion of the building.

The second type of O&L coverage afforded by the policy is called Demolition Costs and Increased Costs of Construction. This additional coverage provides payment to an insured for the costs incurred to demolish the aforementioned undamaged portions of a partially damaged building when required to do so by the enforcement of an ordinance or law.   Without such coverage, the Policy would only provide for payment to raze the damaged portion of the

[36] Policy, attached as Exhibit 1, page Hartford 08214.
[37] Policy, attached as Exhibit 1, page Hartford 08214.

TPGL 3178467v1

building, despite the local ordinance mandating a complete demolition. This coverage also provides for the increased costs, if any, to rebuild the building to current building codes. Coverage for increased costs of construction applies if, and only if, an insured actually incurs additional costs in repairing, replacing, or rebuilding its property by virtue of having to comply with certain building codes above and beyond what existed at the time of loss. For example, if an insured property did not have fire sprinklers at the time it was destroyed, yet to replace the property the insured had to install fire sprinklers to meet building code, then the cost of those fire sprinklers would be covered under the Increased Cost of Construction provision of the Ordinance or Law coverage if such costs are actually incurred. The pertinent portion of the Ordinance or Law provision provides:

**(2) Demolition Costs and Increased Cost of Construction**

(a)  We will pay the actual cost to demolish the undamaged portion of the covered building and to clear the site of the undamaged portion of the building when required to do so by the enforcement of the building, zoning or land use ordinance or law; and

(b)  If the covered building is subject to the Replacement Cost Valuation provision as shown in the Property Choice Declarations and you rebuild the building, we will pay for the actual increased costs to repair, replace or rebuild the building at the same premises or at another premises, if required by the ordinance or law, for the same general size and the same general use, to the minimum requirements of such ordinance or law.

We will not pay for these increased costs until the building is actually repaired or replaced.

You may choose to replace the Building at another premises, however we will not pay more for increased cost of construction at the new premises than the amount of such costs we would have paid to replace the building at the original premises.[38]

In the instant case, this portion of the Policy would respond to the demolition costs as well as the additional costs of construction, up to the limit of insurance for ordinance or law coverage, to

---

[38] Policy, attached as Exhibit 1, page Hartford 08214-8215.

TPGL 3178467v1

change the architectural design from a strip mall to a multiple-building town center design as required by the enforcement of local ordinances.

Both coverages are subsections of the general Ordinance or Law Additional Coverage. There is only one Limit of Insurance for Ordinance or Law, irrespective of whether only one or both subsections apply.  In accordance with Subsection (4) of the Ordinance or Law Additional Coverage, the Limit of Insurance for the entire Ordinance or Law Additional Coverage is the applicable Ordinance or Law – Demolition Cost and Increased Cost of Construction Limit of Insurance of $1,000,000.[39]  Thus, no more than $1,000,000 is ever due under the Policy for any losses caused by the enforcement of an Ordinance or Law, including additional costs to repair, rebuild, replace, demolish or make code compliant any undamaged portions of damaged buildings.

Here, Hartford has already paid $2,297,923 for the Value of the Undamaged Building, $132,634.88 to demolish the undamaged portion of the building and $867,365.20 for the Increased Costs of Construction.[40]  As a result, Plaintiffs have received amounts that far exceed the limit of insurance for Ordinance or Law coverage.  Plaintiffs' contend that there is essentially no limit to the coverage for the value of the undamaged portion of the building other than the building limit of $5 million plus inflation guard and that the increased cost of construction coverage is due upon their purchase of the replacement building in Texas.  To require the jury to resolve these substantial legal issues relating to policy interpretation would unreasonably divert

---

[39] Policy, attached as Exhibit 1, page Hartford 08215.
[40] The RCV for the damaged portion of the building was $1,106,659.  All RCV in excess of the RCV for the damaged portion is attributable to the undamaged portion of the building, including the $121,885 paid for tenant improvements in Panda.  (Unsworn Declaration of Kimberley Dodd, ¶¶ 14, attached as Exhibit 12.)

its attention from the true factual disputes between the parties – the estimated costs of construction.

## 2. Coverage for Increased Cost of Construction is not due unless incurred

The Policy provides coverage for increased cost of construction only when such costs are actually incurred. The pertinent portion of the Ordinance and Law provision provides:

**(2) Demolition Costs and Increased Cost of Construction**

(b)  If the covered building is subject to the Replacement Cost Valuation provision as shown in the Property Choice Declarations and you rebuild the building, *we will pay for the actual increased costs or repair, replace or rebuild the* building at the same premises or at another premises, *if required by the ordinance or law*, for the same general size and the same general use, to the minimum requirements of such ordinance or law.

*We will not pay for these increased costs until the building is actually repaired or replaced.*

You may choose to replace the Building at another premises, however we will not pay more for increased cost of construction at the new premises than the amount of such costs we would have paid to replace the building at the original premises.[41]

(Emphasis Added).  The Policy covers only "*actual* increased costs to repair, *replace* or rebuild" the Subject Property and only "if required by the ordinance or law."  Courts interpreting policies with similar provisions have held that actual costs must be incurred before insurance payment for such costs is due.  See <u>Tamco Corporation v. Federal Insurance Co. of NY</u>, 216 F. Supp. 767 (1963) (D.N.D. Ill. E.D.) (Insurer not liable to pay replacement cost until building actually repaired, rebuilt, or replaced.  Policy provided 'This policy does not cover '(b) any loss unless and until the damaged or destroyed property is actually repaired, rebuilt or replaced on the same or another site. . .');  <u>Kolls v. Aetna Causlaty and Surety Co.</u>, 378 F.Supp. 392 (USDC S.D.

---

[41] Policy, attached as Exhibit 1, page Hartford 08214-8215.

Iowa, C.D.) (Insurer only liable to pay replacement costs once cost to repair or replace property is actually expended.  Policy language provided that Insurer not liable "unless and until the damaged property is actually repaired or replaced with due diligence and dispatch, and, in no event, unless repair or replacement is completed within a reasonable time after such loss'); State Farm Fire and Casualty Company v. Patrick, 647 So.2d 983 (1994) (Insurer was obligated to pay the replacement cost only once cost incurred).  The language in the Policy at issue is analogous to language found in the policies at issue in the case law cited above, and should be interpreted in the same manner, thereby requiring Plaintiffs to actually incur increased costs of construction prior recovery of insurance proceeds under the increased cost of construction coverage.

In a case involving an analogous factual situation and analogous policy language, the U.S. District Court for the Western District of Washington held the insured was not entitled to payment for increased cost of construction where the insured purchased a code-compliant replacement building.  Snoqualmie Summit Inn v. Travelers Property and Casualty, 2007 WL 709297[42].  In Snoqualmie Summit Inn  Plaintiff argued that it should receive increased construction costs when the building is replaced, regardless of whether it built the replacement or purchased a pre-existing code-compliant structure at a different location.  In support of its argument, plaintiff claimed that the policy was ambiguous on the issue of whether increased costs of construction would be payable in the event the insured replaces its property.  The court found in favor of the insurer, holding that the policy unambiguously covers increased cost of construction *only* if incurred.  The court relied in part upon the policy provision stating: "We will not pay for increased construction costs under this coverage:  (a) Until the property is actually

---

[42] Snoqualmie Summit Inn v. Travelers Property and Casualty, 2007 WL 709297, attached as Exhibit 21.

17

repaired or replaced, at the same location or elsewhere....." The Policy at issue in the present case contains a nearly identical provision: "We will not pay for these increased costs until the building is actually repaired or replaced."[43]  In analyzing the situation the court noted that "[i]t would be illogical for Plaintiff to receive additional funds to pay for the increased cost of construction when nothing is actually built."  The court further noted the absurd result if the insured were able to recover for increased costs of construction not incurred: "Under Plaintiff's interpretation, it could theoretically purchase an identical structure directly adjacent to the original structure, made to the same specifications, and retain the increase for ordinance or law upgrades as a windfall."  Snoqualmie, 5.  This is exactly the windfall that Plaintiffs seek to benefit from in the case at hand.

In light of the foregoing, Hartford asks this Court to construe the Policy according to its unambiguous terms and issue an opinion that Increased Costs of Construction are only due if and when such costs are incurred.

**E.  Plaintiffs' claim for Bad Faith must be dismissed as Plaintiffs have failed to present any admissible evidence to support a claim of bad faith.**

Hartford also requests this Court dismiss Plaintiffs' claim for bad faith because Plaintiffs' have presented no admissible evidence as to the issue of bad faith.  Plaintiffs' only expert testimony regarding the issue of bad faith should not be allowed into evidence at trial given the expert's lack of qualification and the lack of reliability of the opinions and testimony he has offered as to the issue of bad faith.  The exclusion of Plaintiffs' only bad faith expert will be the subject of a separate Motion, to be filed at the appropriate time, which should be considered by the Court in conjunction herewith.

---

[43] Policy, attached as Exhibit 1, page Hartford 08215.

In order to state a cause of action for bad faith refusal to pay first party benefits, a plaintiff must establish: (1) the existence of a mutually binding contract of insurance between the plaintiff and the defendant; (2) refusal by the insurer to pay benefits due under the contract; (3) resulting from the insurer's bad faith or unreasonable action and breach of an implied covenant of good faith and fair dealing arising on the contract; (4) causing damage to the insured. Crossley v. State Farm Mut. Auto Insurance Co., 415 S.E.2d 393 (S.C. 1992).  Plaintiffs must prove that Hartford had no reasonable basis for actions taken in adjusting the insurance claim. Id.  To prove the absence of a reasonable basis for denying benefits under the insurance policy, the Plaintiffs must show that a reasonable insurer would not have denied or delayed payment of the claim under the circumstances as alleged by the Plaintiffs.  Trimper v. Nationwide Ins. Co., 540 F.Supp. 1188, 1194 (D.S.C. 1982) (holding that an insurer is liable for bad faith only where it fails to exercise "ordinary and reasonable care in the adjustment of claims").  In this respect, a bad faith claim is identical to a professional negligence claim in that it requires an analysis of the insurer's conduct based upon the prevailing standard of care in the industry.

"In South Carolina, expert testimony is required in a professional negligence action to establish both the standard of care and the defendant's failure to conform to that standard." Spires v. Acceleration Nat. Ins. Co., 417 F.Supp.2d 750, 754 (D.S.C. 2006) (citing Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc., 570 S.E.2d 197, 203 (S.C. 2002)).  In Spires, this Court held that a plaintiff must present expert testimony regarding the appropriate professional standard of care for an insurance agent in the context of a negligence claim.  Id.  Similarly, under the facts of this case, the Plaintiffs must present expert testimony to establish the standard of care applicable to Hartford.

TPGL 3178467v1

This action involves the adjustment of a highly complex property claim and the conduct of Hartford must be examined in light of these circumstances.  The reasonableness of Hartford's decisions made in the course of adjusting this claim is not a subject matter "within the ambit of common knowledge so that no special learning is required to evaluate the conduct of [Hartford]." David v. McLeod Regional Med. Ctr., 626 S.E.2d 1, 3-4 (S.C. 2006).  As such, the Plaintiffs must introduce expert testimony to establish the relevant standard of care.  Other courts have held that in cases such as this, expert testimony is required.  See e.g., Qualls v. State Farm Lloyds, 226 F.R.D. 551 (N.D. Tex. 2005) (holding that the insured was required to produce expert testimony when issues not within general experience and common sense of lay person); Talmage v. Harris, 354 F.Supp.2d 860, 865-66 (W.D. Wis. 2005) (holding that expert testimony is required when the plaintiff's bad faith claim "implicate[s] complex industry practices or procedures" outside the common knowledge and ordinary experience of an average juror.); Datillo v. State Farm Ins. Co., 1997 WL 644076, at 5 (E.D.Pa. 1998)[44] (considering expert testimony relevant in claims involving complex or highly technical insurance issues);  see also, 17 Couch on Ins. § 252:25 (3d ed. 2004) ("Testimony by an expert is almost always useful as to what facts are critical in the assessment of whether or not the insurer acted in bad-faith").

In order to maintain an action for bad faith the Plaintiffs must present expert testimony to establish the applicable standard of care and Hartford's failure to conform therewith.  The appropriate course of conduct for an insurance company in its adjustment of a complex property

---

[44] Datillo v. State Farm Ins. Co., 1997 WL 644076, attached as Exhibit 22.

claim is not a matter of common knowledge and expert testimony is required.  Without such expert testimony, Plaintiffs claim for bad faith must fail.[45]

### 3.  Liability for Attorneys' Fees when insurer has refused to pay claim

Plaintiffs have also brought a claim under Section 38-59-40 of the South Carolina code, which provides in pertinent part:

> In the event of a claim, loss, or damage which is covered by a policy of insurance or a contract of a nonprofit hospital service plan or a medical service corporation and the refusal of the insurer, plan, or corporation to pay the claim within ninety days after a demand has been made by the holder of the policy or contract and a finding on suit of the contract made by the trial judge that the refusal was without reasonable cause or in bad faith, the insurer, plan, or corporation is liable to pay the holder, in addition to any sum or any amount otherwise recoverable, all reasonable attorneys' fees for the prosecution of the case against the insurer, plan, or corporation. The amount of reasonable attorneys' fees must be determined by the trial judge and the amount added to the judgment. The amount of the attorneys' fees may not exceed one-third of the amount of the judgment.

To recover under Section 38-59-40 a Plaintiff must show bad faith or an unreasonable refusal to pay a claim.  (See Wiggins v. Travelers Ins. Co., 498 F.Supp 211 (D.S.C 1979)  Attorney's fees not awarded where insurer's actions are not unreasonable or in bad faith.)  Just as Plaintiffs claim for bad faith must fail, so must Plaintiffs claim for attorney's fees pursuant to Section 38-59-40.  Just as Plaintiffs claim for bad faith must fail, so must Plaintiffs claim for attorney's fees pursuant to Section 38-59-40.  Given the complex nature of this claim, it is imperative that the Plaintiff must provide expert testimony as to the applicable standard of care and Hartford's failure to conform therewith.

---

[45] Hartford will file an Motion to Exclude testimony of Plaintiff's only expert on insurance standard of care at the appropriate time.  In that Motion Hartford will show the testimony of Plaintiff's purported expert should be excluded pursuant to this Courts gate keeper function in accordance with Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and its progeny.

TPGL 3178467v1

## Conclusion

In light of the foregoing, Hartford requests this Court to issue an Order that the Ordinance or Law limit is $1,000,000 and that Increased Costs of Construction are not due unless and until such costs are actually incurred. Additionally, Hartford requests this Court grant summary judgment to Hartford on Plaintiffs' bad faith claim and its claim for attorneys fees under § 38-59-40 on the basis of lack of evidence, as will be shown in the Motion to exclude the testimony of Plaintiffs' bad faith expert.

TURNER PADGET GRAHAM & LANEY P.A.


By: s/John S. Wilkerson, III
    John S. Wilkerson, III,
    Federal ID No. 4657
    M. Britton Mason
    Federal ID No. 10085
    P.O. Box 22129
    Charleston, South Carolina  29413
    Telephone:  843-576-2801
    Facsimile:  843-577-1649
    Email:  JWilkerson@TurnerPadget.com
            bmason@turnerpadget.com

    ATTORNEYS FOR DEFENDANT
    HARTFORD FIRE INSURANCE COMPANY

March 19, 2009

22