**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION**

| | |
|---|---|
| GATOR WACCAMAW SHOPPING CENTER, LTD. and GATOR DEVELOPMENT, INC., | ) Case No. 4:09-cv-00393-TLW-TER<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) **PLAINTIFFS' MOTION FOR PARTIAL**<br>) **SUMMARY JUDGMENT** |
| THE HARTFORD FIRE INSURANCE COMPANY, | )<br>)<br>) |
| Defendant. | )<br>) |

### I.    INTRODUCTION

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs Gator Waccamaw Shopping Center, Ltd. and Gator Development, Inc. (collectively "Gator") respectfully move this Court for partial summary judgment.   Gator brought this action against Defendant The Hartford Fire Insurance Company ("Hartford") for breach of insurance contract, bad faith, and attorneys' fees stemming from Hartford's improper handling and adjustment of a fire claim under a commercial property coverage policy issued by Hartford to Gator (the "Hartford Policy" or "Policy").  The fire at issue occurred on May 28, 2008, at Gator's Waccamaw Square Shopping Center premises located at 1625-1641 Church Street, Conway, South Carolina 29526.   Although the fire occurred more than twenty-two months ago, Hartford has not yet fully paid Gator's loss in accordance with the terms of its insurance policy.  Gator now moves for partial summary judgment on seven principal issues with respect to coverage afforded under Hartford's Policy, briefly stated as:

1.    Hartford's payments to Gator for actual cash value and replacement cost are to be determined *as of the time of the loss or damage*, not as of a date(s) more than a year after the loss occurred.

2.    The Hartford Policy provides that Hartford will pay for the full value of the undamaged portion of the Waccamaw Square building up to the Policy's limit of $5,364,931.48.

     a.    Hartford's payment for the undamaged portion of the Waccamaw Square building is included within the Policy limits, plus "Inflation Guard," on a replacement cost basis. The Policy does *not* provide that the value of the undamaged portion of the building is to be included in and limited by the $1,000,000 limit for the "Demolition Costs and Increased Cost of Construction" coverage.

     b.    The Hartford Policy also does *not* permit Hartford to deem the additional $1,000,000 in coverage for "Demolition Costs and Increased Cost" as a "sublimit" and be within the policy limit of $5,364,931.48. Rather, it is an *additional* $1,000,000 of insurance, above and beyond the Policy limit of $5,364,931.48.

3.    The Harford Policy provides coverage for the replacement cost of Gator's Waccamaw Square building at *another site at* the *original premises*. The Hartford Policy also provides that Hartford must pay the replacement cost of the undamaged portion of the building, which the City of Conway will only approve to be rebuilt at *another site at* the *original premises*.

4.    Harford's own expert has calculated that the full cost to relocate the Waccamaw Square building to another site at the original premises to be $6,447,549. Based on Hartford's own calculations and admissions, Gator is entitled to receive the replacement cost Policy limit of $5,364,931.48, plus the $1,000,000 in "Increased Cost of Construction" limit.

5.    The Hartford Policy provides a separate amount of insurance up to $50,000.00 for "Debris Removal," apart from the $1,000,000 "Demolition Costs and Increased Cost of Construction" coverage.

6.    Hartford owes "Claim Expense" to Gator as a matter of law.

7.    Gator is entitled to its full closing costs incurred with respect to a replacement property that was selected with Hartford's express approval.

     Grounds and support for Gator's Motion for Partial Summary Judgment on each of the

above-described issues, including the applicable Hartford Policy language, pertinent background

and admissions of Hartford's Rule 30(b)(6) representative and testifying experts, and attached exhibits, are set forth more fully below.

## II.    THE HARTFORD POLICY ISSUED TO GATOR

Hartford issued a "Special Multi-Flex" Policy (previously defined as the "Hartford Policy" or "Policy"), bearing policy number 83 UUN IU0432, with a policy period from June 30, 2007 to June 30, 2008.[1]   Plaintiffs Gator Development Ltd. and Gator Waccamaw Shopping Center Ltd. are both identified in the Hartford Policy as Named Insureds.[2]   Under the Policy, Hartford insured multiple commercial properties, collecting a substantial one-year premium of $377,539.26.[3]   One of the properties insured by Hartford was Gator's Waccamaw Square Shopping Center, located at 1625-1641 Church Street, Conway, South Carolina 29526 (the "Waccamaw Property").[4]

Harford provided a limit of liability of $5,000,000 for the Waccamaw Property, which is further adjusted and automatically increased pursuant to an "Inflation Guard" provision.[5]   The Policy's Property Choice-Schedule of Coverages further states that such coverage was afforded to Gator on a "replacement cost" basis.[6]  This Schedule further provides the following additional coverages above and beyond the policy limit:

- Business Interruption                    $13,866,300
  (including Extra Expense)
- Claim Expenses                          $50,000
- Debris Removal (Additional Coverage)    $50,000
- Inflation Guard                         Consumer Price Index Up to 8%
- Ordinance or Law Coverage               Included in Building Limit

---

[1] Hartford Special Multi-Flex Policy, Policy No 83 UUN IU0432, relevant excerpts of which are attached hereto as Exhibit A. A full copy of the Policy is attached to Gator's Complaint as Exhibit A.

[2] Id.; see also Endorsement Form IH1200115T, p. 1.

[3] Id. at Common Policy Declarations, Form HM 00 10 01 07T, p. 1.

[4] Id. at Property Choice- Schedule of Premises and Coverages, Form PC 00 02 01 03T, p. 27.

[5] Id. at Property Choice- Schedule of Premises and Coverages, Form PC 00 02 01 03T, p. 1; Property Choice Coverage Form PC 00 10 01 03, p. 7.

[6] Id. at Property Choice- Schedule of Premises and Coverages, Form PC 00 02 01 03T, p. 3.

CHARLESTON\405394v1

(Value of Undamaged Building)
- Ordinance or Law Coverage                    $1,000,000
  (Demolition Costs and Increased Cost of Construction)[7]

The particular Hartford Policy provisions, as they apply to each of Gator's requests for partial summary judgment, will be set forth in detail below under each applicable argument.

### III.    APPLICABLE LAW WITH RESPECT TO GATOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND THE INTERPRETATION OF INSURANCE POLICY LANGUAGE

#### A.    Summary Judgment Standard

To grant a motion for summary judgment, the Court must find that "there is no genuine issue as to any material fact."  See, e.g., Triplett v. Soleil Group, Inc., 664 F. Supp. 2d  645, 648 (D.S.C. 2009) (citing Fed. R. Civ. P. 56(c)).  "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate."  Id. (quoting Teamsters Joint Council No. 83 v. Centra, Inc., 947 F.2d 115, 119 (4th Cir. 1991)).  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).  Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual bases."  Id. (quoting Celotex, 477 U.S. at 327).

#### B.    Interpretation of Insurance Contracts

Under South Carolina law, insurance policies are subject to the general rules of contract construction.  See, e.g., Continental Cas. Co. v. Penn Nat'l Ins. Co., 128 Fed. Appx. 957, 960 (4th

---

[7] Id. at Property Choice- Schedule of Premises and Coverages, Form PC 00 02 01 03T, pp. 1, 2, 27. The Court will note that this separate $1,000,000 is set apart on the Schedule of Premises and Coverages, and is listed separately from the Policy limit of $5,000,000 for the Building (prior to application of Inflation Guard coverage).

Cir. 2005) (a copy attached as part of Exhibit BB).  The Fourth Circuit Court of Appeals has

held:

> A court must give policy language its plain, ordinary, and popular meaning. An insurer's obligation under a policy of insurance is defined by the terms of the policy and cannot be enlarged by judicial construction. However, where present, ambiguous or conflicting terms in an insurance policy must be construed liberally in favor of the insured and strictly against the insurer.

Id. (quoting Sunex Int'l, Inc. v. Travelers Indemnity Co., 185 F. Supp. 2d 614, 617 (D.S.C. 2001)

(citations omitted)); accord Poston v. National Fidelity Life Ins. Co., 303 S.C. 182, 399 S.E.2d

770, 772 (1990) ("Where language used in an insurance contract is ambiguous, or where it is

capable of two reasonable interpretations, that construction which is most favorable to the

insured will be adopted."); Grayson v. Aetna Ins., 308 F. Supp. 922 (D.S.C. 1970); Brooklyn

Bridge, Inc. v. South Carolina Ins. Co., 309 S.C. 141, 420 S.E.2d 511 (Ct. App. 1992); Charles v.

Canal Ins. Co., 238 S.C. 600, 121 S.E.2d 200 (1961).  An insurance contract "should be

construed so as to give, if possible, full force and effect to every part of it."  See, e.g., Fabri v.

The Hartford, 69 Fed. Appx. 187,  191 (4th Cir. 2003) (a copy attached as part of Exhibit BB).

## IV.    ARGUMENT AND PERTINENT FACTS

**A.    Hartford's Payments for Actual Cash Value and Replacement Cost Are To Be Determined As Of The Time Of The Loss Or Damage, Not As Of Dates Years After The Loss.**

Hartford has identified Laverne Graham and Steve Watkins from Watkins Services and

Jesse G. Fields as its construction experts to testify as to the amount of loss incurred by Gator in

the fire that would be covered under Hartford's Policy.[8]  In sworn depositions in this case,

Hartford's disclosed construction experts have testified that they have calculated Gator's losses

---

[8] Nothing herein should be construed as a concession by Gator that these individuals would, in fact, qualify as experts or that their testimony constitutes expert testimony admissible at trial.

from the fire utilizing estimates from 2009 and 2010.[9]   In generating their expert report, the Watkins Services experts relied extensively on local subcontractors to determine prices for particular trades.[10]   Each of these subcontractors confirmed in their sworn depositions that their estimates were based on 2009 and 2010 prices.[11]   In addition, several of these contractors testified that if they had used estimates at the time of loss in 2008, rather than in 2009 and 2010, the amount of loss would likely be higher because of the deterioration of market conditions since May of 2008.[12]

The Hartford Policy, however, provides that Gator's loss is to be calculated as of the time of loss or damage, and not as of some future date as Hartford's designated experts have done.[13] The Property Choice Coverage Form of the Policy provides, in pertinent part:

### E.    LOSS PAYMENT AND VALUATION CONDITIONS

Covered Property will be valued at either Replacement Cost or Actual Cash Value, as stated in the Property Choice Declarations and as described below except for the items listed below in item 3.  Specific Property Valuations.  We will not pay more than your financial interest in the lost or damaged property.

* * *

### 1.    Replacement Cost

*In the event of covered loss or damage, **we** [Hartford] **will determine** the value of Covered Property at the actual amount spent to **repair**, **replace** **or** **rebuild** the damaged property **as of the time of the loss or damage**, at the same site **or another site**, subject to the following:*

---

[9] See Exhibit B (Deposition of Jesse G. Fields) at p. 47, ll. 15-22; Exhibit C (Deposition of Laverne Graham) at p. 61, ll. 3-14; Exhibit D (Deposition of Steve W. Watkins) at p. 26, l. 21 - p. 27, l. 11.

[10] See Exhibit D (Watkins Dep.) at p. 26, ll. 15-20; Exhibit C (Graham Dep.) at p. 17, l. 19 - p. 18, l. 2.

[11] See Exhibit E (Deposition of Guy Smith) at p. 20, l. 21 - p. 21, l. 2; Exhibit F (Deposition of Allen Thomas) at p. 11, l. 25 - p. 12, l. 9; Exhibit G (Deposition of James Scott) at p. 10, ll. 18-22; Exhibit H (Deposition of Jeff Martin) at p. 10, ll. 8-15; Exhibit I (Deposition of Ronald Hermann) at p. 22, ll. 14-22; Exhibit J (Deposition of John Jeff Montgomery) at p. 23, ll. 11-14.

[12] See, e.g., Exhibit B (Fields Dep.) at p. 48, ll. 12-14; Exhibit C (Graham Dep.) at p. 59, ll. 20-25; Exhibit J (Montgomery Dep.) at p. 23, ll. 11-22 (the cost of unreinforced concrete blocks decreased "30 to 50 percent" between 2008 and 2010); Exhibit I (Hermann Dep.) at p. 22, ll. 3-6.

[13] In the deposition of Hartford's expert, Joe Eudy, he testified  that the date of the loss (May 28, 2008) is the date that should be used to calculate the value of the loss.  See Exhibit K (Eudy Dep.) at p. 110, l. 8 – p. 111, l. 22.

(a)　　We will not pay more for lost or damaged property than the least of:

    (1)　　The Limit of Insurance applicable to the lost or damaged property;

    (2)　　The amount it should cost to replace, on the same premises, the lost or damaged property with other property;

        (a)　　Of comparable material and quality; and
        (b)　　Used for the same purpose; or

    (3)　　The amount you actually spend that is necessary to repair or replace the lost or damaged property with other property;

        (a)　　Of comparable material and quality; and

        (b)　　Used for the same purpose.

    (4)　　***In the event of a total loss to Building property, you may choose to <u>replace</u> your building at <u>another premises</u>, however, we will not pay more than the cost to replace the property at the <u>original premises</u>***.

    (5)　　Replacement Cost does not include any increased cost attributable to enforcement or any ordinance or law regulating the construction, use or repair of any property.

(b)　　We will pay on an Actual Cash Value basis until the lost or damaged property is actually repaired, rebuilt or replaced.

(c)　　If you do not repair, replace or rebuild on the ***<u>same site</u> <u>or</u> <u>another site</u>*** within 2 years of the date of loss, we will pay you on an Actual Cash Value basis.

\* \* \*

**2.　Actual Cash Value**

a.　　We will pay you on an Actual Cash Value basis if:

    (1)　　The valuation of the lost or damaged property is designated in the Property Choice Declarations as Actual Cash Value.

    (2)　　You elect Actual Cash Value as the basis for loss payment ***<u>at the time of loss or damage.</u>***

      b.     In the event of covered loss or damage, at our option, we will do one of the following, but not pay more than the Limit of Insurance applicable to the lost or damaged property:

       (1)     Pay the value of the lost or damaged property ***at the time of loss;***

       (2)     Take all or any part of the property at an agreed or appraised value; or

       (3)     Repair, rebuild ***or replace*** the property with other property of like kind and quality, or pay you the cost to do so . . . . [14]

The Hartford Policy also provides "Inflation Guard" coverage to Gator.    The Policy states, in pertinent part:

      **p.**     **Inflation Guard**

In the event of a Covered cause of loss or damage to covered property at a "Scheduled Premises" ***the Limits of Insurance that apply to damaged Buildings and Business Personal Property at "Scheduled Premises" where the loss or damages occurs will automatically increase*** by a factor based on the accumulated U.S. Government Consumer Price (CPI) Index for the months ***from the inception of this policy until the date of loss***.    But in no event will we pay more than an additional 8% of the applicable Limit of Insurance. [15]

The above Policy "Replacement Cost" and "Actual Cash Value" provisions indisputably provide that Gator's fire loss is to be adjusted and calculated as of the "time of loss or damage." Numerous cases have addressed standard policy provisions that require that the loss be determined as of the date of the event causing the loss, and not at some later point in time. See, e.g., Hendricks v. American Fire & Cas. Co., 247 S.C. 479, 483, 148 S.E.2d 162, 164 (1966) (appraisers determine property claim at time of the loss); Berkshire Mut. Ins. Co. v. Moffett, 378 F.2d 1007, 1017 (5th Cir. 1967) (the property loss is to be valued at the time of the loss, so as to place the insured in the same position in which in which he would have been no fire had occurred at such time); Worcester Mut. Fire Ins. Co. v. Eisenberg, 147 So. 2d 575, 576 (Fla. Ct.

---

[14] Property Choice Coverage Form PC 00 10 01 03, pp. 14-15 (emphasis added).
[15] Property Choice Coverage Form PC 00 10 01 03, p. 7 (emphasis added).

App. 1962) (the evidence must establish what was the value of the damaged or destroyed property at the time of loss) (a copy attached as part of Exhibit BB); Farmland Industries, Inc. v. National Union Fire Ins. Co. of Pittsburgh, Pa., 359 F. Supp. 2d 1144, 1150 (D. Kan. 2005) (policy clearly provided that the basis for settlement was time of the loss, regardless of whether or not prices increased or decreased after the time of the loss); Potomac Ins. Co. v. Woods, 1996 WL 450687 (E.D. Tex. July 22, 1996) (a copy attached as part of Exhibit BB) (the claim for insurance benefits accrues at the time of the fire, and it would be illogical to adopt any rule which makes an insurer's duty to pay a function of the speed with which it processes the claim).

The Hartford Policy's express language that the loss is to be determined "at the time of loss or damage" is further reinforced by the "Inflation Guard" coverage, which increases the limits of insurance available for loss or damage by a CPI factor from the date of inception of the policy "until the date of loss."  There simply are no Policy provisions that permit Hartford to use dates later in time to obtain estimates, bids or other calculations of Gator's loss.  Yet, because construction prices since May 2008 have been dramatically declining due to the economic recession, that is precisely what Hartford and its experts are trying to do.  Twenty-two (22) months have come and gone after the fire, and Hartford is attempting to use that passage of time to violate its Policy's provisions and lessen its payment obligations.  Hartford's expert, Eudy, testified that the value of loss should be calculated on the date of the loss to prevent parties from delaying when to do so would be advantageous.[16]

Gator respectfully requests that the Court grant partial summary judgment on this issue, and order that the replacement cost and actual cash value calculation of the fire loss are to be

---

[16] Exhibit K (Eudy Dep.) at p. 111, ll. 15-22.

determined pursuant to the clear and unambiguous Policy provisions—the loss payable is to be determined as of the time of the loss.[17]

### B. The Hartford Policy Provides That It Will Pay For The Full Value Of The Undamaged Portion Of The Waccamaw Square Building Up To The Policy's Limit Of $5,364,931.48.

The Hartford Policy issued to Gator clearly provides a limit of insurance for the Waccamaw Square building in the amount of $5,000,000.[18]  That amount also is to be increased an additional "Inflation Guard" factor of up to eight percent (8%) from the inception of the loss to the date of the fire, based upon the Consumer Price Index.[19]  Hartford has agreed that the Policy limit, as automatically amended by the Inflation Guard coverage, is $5,364,931.48.[20]

The Hartford Policy further provides "Ordinance or Law" coverage for the "value of the undamaged portion" of the Waccamaw Square building that the City of Conway required to be destroyed, and that such payment is to be made within the $5,000,000 Policy limit coverage, as automatically increased by the Inflation Guard coverage.[21]  The Policy provides:

u.  **Ordinance or Law**

Value of the Undamaged Buildings, Demolition Costs and Increased Cost of Construction Coverages described in (1) and (2) below, apply as shown in the Property Choice Declarations, in the event there is a Covered Cause of Loss to covered Buildings at "Scheduled Premises" and covered "Tenant Improvements and Betterments" at "Scheduled Premises" that results in the enforcement of an ordinance or law that:

(i)  Regulates the construction or repair of buildings, or establishes zoning or land use requirements at the insured premises;

(ii)  Requires the demolition of parts of the same building that are not damaged by a Covered Cause of Loss; and

---

[17] Gator also reserves its right to move at a later time to prevent Hartford from introducing evidence as to the calculations, bids or estimates of loss that are not based upon the time of loss.

[18] Property Choice- Schedule of Premises and Coverages, Form PC 00 02 01 03T, p. 27.

[19] Property Choice- Schedule of Premises and Coverages, Form PC 00 02 01 03T, p. 1.

[20] See Exhibit L, 8/27/08 letter from Kim Dodd, p. 2; and Exhibit M, 3/20/09 letter from Turner Padget, at fn. 3.

[21] Property Choice Coverage Form PC 00 10 01 03, p. 8, Section A., 4 U(1).

CHARLESTON\405394v1

(iii)    is in force at the time of that Covered Cause of Loss.

**(1)    Value of the Undamaged Buildings**

We will pay for the ***value of the <u>undamaged portion of the building</u> that was required to be demolished by the enforcement of building, zoning or land use ordinance or law.  We will do this on the <u>same valuation basis that applies to the entire building</u>.  This does <u>not</u> include any increased costs to repair, replace or rebuild the property due to the enforcement or any ordinance or law.***

***<u>This additional Coverage is included within the Limit of Insurance applicable to the damaged Building or damaged "Tenant Improvements and Betterments . . . ."</u>*** [22]

Because the Hartford Policy is written on a replacement cost basis,[23] this coverage provides that valuation of the undamaged portion of the building also is to be paid on a replacement cost basis.

The Policy further provides an additional $1,000,000 in coverage, above the Policy limit, for "Demolition Costs and Increased Cost of Construction."[24]   This additional $1,000,000 in coverage is separately listed and set apart on the Property Choice Schedule of Coverages declarations page from the $5,000,000 in coverage for the Waccamaw Square building (prior to the application of the "Inflation Guard" coverage).[25]   With respect to such additional $1,000,000 in coverage, the Hartford Policy provides, in pertinent part:

**(2)    Demolition Costs and Increased Cost of Construction**

(a)    We will pay the actual cost to demolish the undamaged portion of the covered building and to clear the site of the undamaged portion of the building when required to do so by the enforcement of the building zoning or land use ordinance or law; and

(b)    If the covered building is subject to the Replacement Cost Valuation provision as shown in the Property Choice Declarations, and you rebuild the building, we will pay for the actual increased costs to repair, replace or rebuild the building at the same premises or at another premises, if

---

[22] Id.
[23] See Property Choice- Schedule of Premises and Coverages, Form PC 00 02 01 03T, p. 3.
[24] See Property Choice- Schedule of Premises and Coverages, Form PC 00 02 01 03T, p. 27.
[25] Id.

required by the ordinance or law, for the same general size and same general use, to the minimum requirements of such ordinance or law.

We will not pay for these increased costs until the building is actually repaired _or replaced._

_**You may choose to replace the Building at another premises**, however, we will not pay more for increased cost of construction at the new premises than the amount of such costs we underline would have paid to replace the building at the original premises._[26]

Gator was required by the City of Conway to fully demolish and remove the damaged and undamaged portions of the Waccamaw Square building as a result of the fire.[27]   The City ordered that the entire building be demolished, including undamaged freight docks, underground pipes and slab under the building.[28]   The parking lot above the underground pipes would also need to be demolished so that these pipes could be updated to code**.**[29]

The City of Conway further ordered that Gator could not receive a building permit unless and until the building was located on another site/footprint at the original premises.[30]   The City of Conway also would not approve the rebuilding of the Waccamaw Square building unless new underground piping beneath the building was installed at this location on the original scheduled premises.[31]   As a result, Gator fully razed the Waccamaw Square building to the ground, including the building structure, its freight docks, portions of the parking lot and the piping underneath.[32]

Gator's undamaged portion of the building, including its freight docks, underground pipes and parking lot are "Covered Property" under the Policy, and replacement coverage is due and payable for them up to the Policy limit, with Inflation Guard, under the "Value of

---

[26] Id. (emphasis added).
[27] See Exhibit N, 9/17/08 letter from the City of Conway.
[28] See Exhibit O, 6/10/09 CAB Meeting Minutes, pp. 11 - 13 and 25; Exhibit S, 7/22/09 CAB Minutes.
[29] See Exhibit N, citing Section 5-1-62 of the City of Conway Ordinances; Exhibit S, 7/22/09 CAB Minutes.
[30] See Exhibit O, 6/10/09 CAB Meeting Minutes, pp. 16 - 17; Exhibit S, 7/22/09 CAB Minutes.
[31] See Exhibit P, 12/4/09 Venture Engineering Site Evaluation Report, p. 3.
[32] See Exhibit AA (demolition photographs).

CHARLESTON\405394v1

Undamaged Buildings" coverage, as set forth above.  The Property Choice Coverage Form of the

Policy provides, in pertinent part:

### A.      COVERAGE

We will pay for direct physical loss of or direct physical damage to the following types of Covered Property caused by or resulting from a Covered Cause of Loss.  Covered Property, as used in this Coverage Part, means the type of property described in this Section, A.1.  Covered Property, if a Limit of Insurance is shown in the Property Choice Declarations for that type of property.

### 1.      Covered Property

a.      Building means ***buildings or structures*** that you own or are responsible for insuring including buildings or structures in the course of construction and alterations, repairs or additions to the building ***as shown by the premises address in the Property Choice Scheduled Premises section of the Property Choice Declarations.***

Building ***also*** includes:

(1)      ***Its foundation*** and foundations of machinery and boilers;

(2)      ***Underground pipes***, flues or drains ***necessary for the service of the building;***

(3)      ***Excavations, grading***, backfilling or filling that are necessary to repair, rebuild or replace the building;

* * *

(6)      ***Materials***, equipment and supplies, ***used in the construction, alteration or repair of buildings***;

* * *

(9)      ***Property owned by you for the maintenance or service of the building or its premises***, including fire extinguishing equipment, alarm communication and monitoring systems, and lawn maintenance or snow removal equipment; . . . .[33]

Clearly, Gator's freight docks are part of its covered "building." The docks also

constitute existing covered "structures" on the insured premises.  The docks also provide for the

---

[33] See Property Choice Coverage Form PC 00 10 01 03, p. 1 (emphasis added).

"service" of the building under paragraph (9) above.  The underground pipes are specifically covered under paragraph (2) above, and also provide the servicing of the building and its premises under paragraph (9) above.  The portion of the parking lot, which is required to be destroyed and replaced to reconstruct the building, constitutes covered grading under paragraph (3) above, and it also services the building or its premises, pursuant to paragraph (9).  Furthermore, each of these items is material that will be used in the construction or alteration or repair of the Waccamaw Square building, and each is not otherwise excluded.[34]

Hartford initially refused to recognize that the City of Conway's ordinance required Gator to completely demolish the Waccamaw Square building, and it wrongfully refused to recognize that Ordinance or Law coverage was available to Gator under the Policy.[35]  As will be discussed below, Hartford has now taken additional positions that conflict with the Policy's provisions.

> **a.     Hartford's Payment For The Undamaged Portion Of The Waccamaw Square Building Is Included Within The Policy Limits, Plus "Inflation Guard," On A Replacement Cost Basis.  The Policy Does Not Provide That The Value Of The Undamaged Portion Of The Building Is To Be Included In And Limited By The $1,000,000 Limit For The "Demolition Costs/Increased Cost Of Construction" Coverage.**

Despite its Policy language, Hartford's experts, Eudy and Frediani are also now suggesting that the $1,000,000 in additional increased cost of construction/demolition of undamaged property coverage somehow includes the value of the undamaged portion of the building, including the parking lot and underground piping that existed prior to the loss, and that Gator's recovery for the value of the undamaged portion of the building is limited to $1,000,000.[36]  At the same time, however, Hartford has failed to provide any separate

---

[34] See id., p. 2.
[35] See Exhibit Q, 9/3/08 e-mail from Kim Dodd and  Exhibit R, 8/12/08 e-mail from Kim Dodd.
[36] See Exhibit K (Eudy Dep.) at p. 223.

calculations for the replacement costs for the undamaged and damaged portions of the Waccamaw Square building.[37]    Hartford's experts, Eudy and Frediani, both testified that Hartford calculated the loss on a per square foot basis and, thus, no breakdown was necessary.[38] It has also failed to calculate the difference between the replacement costs of the undamaged and damaged portions of the building and the increased costs to repair, rebuild or replace those portions in accordance to the building code. Rather, without calculating the actual amounts of the undamaged and damaged portions of the building, and without identifying the replacement cost of specific building items and increased costs for such building items as a result of the building code, Hartford has attempted to adjust this loss in a lump sum, cost per square foot fashion.

The Policy language above, however, clearly provides that the replacement cost of the undamaged portion of the Waccamaw Square building is to be first calculated and paid, up to the amount of $5,364,931.48 (the amount that Hartford has agreed is the Policy limit, as amended by the Inflation Guard coverage). Gator respectfully requests that the Court grant to it partial summary judgment, and hold that Hartford must separately calculate and pay the replacement cost amount for such undamaged property, and such payment is to be made within the Policy limit amount of $5,364,931.48, to which Hartford has agreed.

> **b.    The Hartford Policy Does Not Permit Hartford To Deem The Additional $1,000,000 For "Demolition Costs and Increased Cost Of Construction" To Be A "Sublimit" Within The Policy Limit of $5,364,931.48.    Rather, It Is An _Additional_ $1,000,000 of Insurance, Above The Policy Limit.**

Hartford's experts, Eudy and Frediani have also stated that the $1,000,000 of "Demolition Costs and Increased Cost of Construction" is not an additional amount of insurance, but rather

---

[37] See Exhibit M, 3/20/09 letter from John Wilkerson, p. 3; Exhibit K (Eudy Dep.) at p. 39, l. 23 – p. 40, l. 3.
[38] See Exhibit K (Eudy Dep.) at pp 39, l. 23- p. 40, l. 3.

somehow is included within the $5,364,931.48 policy limit.[39]  In essence, Hartford's experts are contending that the $1,000,000 amount is actually a "sublimit" of coverage, as opposed to additional insurance.[40]  However, Hartford can point to no language in the Policy that provides that this coverage is limited to and included within the Building Policy limit of insurance of $5,364,931.48, and is not an additional $1,000,0000 in insurance, above and beyond the Building Policy limit of insurance.

Contrary to Hartford's erroneous position, the Policy's Schedule of Premises and Coverages clearly sets forth that Gator shall receive $1,000,000 of Ordinance or Law (Demolition Costs & Increased Cost of Construction) coverage.[41]  In the Schedule, this separate amount is distinctly listed, and it is set apart from the Building's Policy limit of $5,000,000.[42] Moreover, unlike the "Value of Undamaged Buildings" coverage, which expressly states that is to be calculated within the limit of insurance applicable to the damaged building, the "Demolition Costs and Increased Cost of Construction" coverage contains no such provision.[43] The Harford Policy instead sets out a different and distinct coverage amount for the "Demolition Costs and Increased Cost of Construction" coverage, apart from the Building Policy limit of insurance.  In contrast, no separate limit is shown for the "Value of Undamaged Buildings" coverage.[44] Accordingly, the Policy clearly provides an *additional* amount of insurance of $1,000,000 for "Demolition Costs and Increased Cost of Construction."

If Hartford wanted to include the $1,000,000 in coverage as a "sublimit" within the Policy's Building limit, it had the ability to clearly say so in the Policy.  For example, it could

---

[39] See Exhibit K (Eudy Dep.), p. 103, l. 10 – p. 104, l. 11.
[40] Id.
[41]  Property Choice- Schedule of Premises and Coverages, Form PC 00 02 01 03T, p. 27.
[42]  Id.  This $5,000,000 amount is before Inflation Guard has been applied to amend and automatically increase such policy limit.
[43]   See Property Choice Coverage Form PC 00 10 01 03, pp. 8-9; Property Choice- Schedule of Premises and Coverages, Form PC 00 02 01 03T, p. 2.
[44]  See id.

have expressly stated that such coverage was subject to and was included within the Building Policy limit, as it had done with "Value of Undamaged Buildings."[45]   It also could have clearly provided that the $1,000,000 was a sublimit that would reduce the Building Policy limit.  It did not.  Furthermore, any ambiguity contained in the Policy is to be construed in favor of coverage for the insured, and against the drafter, Hartford.  See, e.g., Continental Cas. Co., 128 Fed. Appx. at 960.  To the extent that the policy language is ambiguous as to this issue, the insured's interpretation is to be followed and coverage afforded. Id.

Gator respectfully moves for partial summary judgment, and requests that the Court hold that the Policy provides an additional $1,000,000 in coverage for "Demolition Costs and Increased Cost of Construction."

C.    **The Harford Policy Provides Coverage For The Replacement Cost Of Gator's Waccamaw Square Shopping Center Building At Another Site At The Original Premises.  The Hartford Policy Also Provides That Hartford Must Pay The Replacement Cost Of The Undamaged Portion Of The Building That The City of Conway Will Only Approve To Be Rebuilt At Another Site At The Original Premises.**

As set forth above, the City of Conway ordered that the Waccamaw Square building be razed to the ground following the fire.[46]  Gator was required by the City to Conway to demolish the entire building, including its freight loading docks, underground piping and parking lot.[47]   In order to receive approval of its plans, Gator also would need to relocate the footprint of the building at the original premises, and reconfigure and construct its parking lot and underground piping for water detention.[48]  Of course, Gator, like any other person or entity constructing a building, must obtain a building permit.  As a practical matter, Gator cannot obtain a permit to

---

[45]  The Hartford Policy similarly treats other coverage this way in the Policy, such as "Building Glass Repairs."  See Property Choice Coverage Form PC 00 10 01 03, p. 3 § A. 4. c. and Property Choice – Schedule of Premises and Coverages, p. 1.

[46]  See Exhibit N, 9/17/08 letter from the City of Conway.

[47]  Id.

[48]  See Exhibit S, 7/22/09 CAB Meeting Minutes, p. 32-33; and Exhibit P, 12/4/09 Venture Engineering Site Evaluation Report, p. 3.

CHARLESTON\405394v1

rebuild on the original site/footprint of the Waccamaw Square building, and the only way it can rebuild is to move the building to another place at the original insured premises address at 1625-1641 Church Street, Conway, South Carolina 29526.

Hartford, however, has refused to make full replacement cost of the Waccamaw Square building. Despite the Policy's language, Hartford has refused to pay the full replacement cost of the building as situated on another site on the original premises, as required by the City of Conway in order to grant a building permit.[49]  Gator can never rebuild on the original footprint, but it is able to rebuild at another site at the original premises of 1625-1641 Church Street, Conway, South Carolina 29526.  Hartford's consultant, Frank Simones, acknowledges that it would cost more to rebuild the building at another site on the original premises, and Hartford is attempting to limit its payment obligation.[50]  Hartford has, nevertheless, refused to pay Gator's full replacement cost to do so.

Hartford's position is incorrect and contrary to its own Policy language.  First, the Policy provides a "Schedule of *Premises* and Coverages," and lists the Waccamaw Square Property as "*Premises* No. 26," with a *premises* address of 1625-1641 Church Street, Conway, South Carolina 29526.[51]  "Covered Property" under the Policy includes "buildings or structures that you own or are responsible for insuring including buildings or structures in the course of construction and alterations, repairs or additions to the building ***as shown by the premises*** ***address in the Property Choice Scheduled Premises section of the Property Choice*** ***Declarations***."[52]  Accordingly, the insured "premises" includes buildings or structures located at the premises address of 1625-1641 Church Street, Conway, South Carolina 29526.

---

[49] See Exhibit O, 6/10/09 CAB Meeting Minutes, pp. 11, 25.
[50] See Exhibit T, 11/26/08 letter from F. Simones, pp. 2-3.
[51] See Property Choice- Schedule of Premises and Coverages, Form PC 00 02 01 03T, p. 27 (emphasis added).
[52] See Property Choice Coverage Form PC 00 10 01 03, p. 1 (emphasis added).

CHARLESTON\405394v1

The Hartford Policy next provides that in the event of covered loss or damage**,** Hartford is required to "determine the value of Covered Property at the actual amount spent to repair, replace or rebuild the damaged property as of the time of the loss or damage, ***at*** the same ***site or another site***…."[53]   The Court will note that although the Policy provides in the Schedule of Premises and Coverages that the "premises" is the 1625-1641 Church Street address, it does not provide any definition of the word "site."   Webster's Dictionary defines "site" as "the spatial location of an actual ***or*** planned structure or set of structures (as a building, town, or monuments,)" "a space of ground occupied ***or*** to be occupied by a building," or "a place, scene, or point of something."[54]   Webster's further defines the word "site" as "to place on site or in ***position***."[55]

The Policy further states that in "the event of a total loss to Building property, you may ***choose*** to replace your building at another premises, however, we will not pay more than the cost to replace the property ***at*** the ***original premises***."[56]   In fact, Hartford's own Rule 30(b)(6) corporate representative testified:

Q:    Is there any provision in the policy that requires that the property at issue here be replaced in the same footprint on the premises as it was originally?

A:    ***No***.[57]

As set forth above, the City of Conway ordered the Waccamaw Square building at the original premises be entirely demolished, and Gator subsequently replaced the property by purchasing another property in Flower Mound, Texas with Hartford's approval.   The City of Conway now requires that the property be located at another site but still at the original premises,

---

[53] See Property Choice Coverage Form PC 00 10 01 03, p. 14 (emphasis added).
[54] Webster's Ninth New Collegiate Dictionary, 1991 (emphasis added).
[55] Id. (emphasis added).
[56] See Exhibit A at Section E. 1. a. (4).
[57] See Exhibit U (K. Dodd, Rule 30(b)(6) Dep.) at p. 172, l. 24 – p. 173, l. 3.

CHARLESTON\405394v1

in order to obtain a building permit.  Accordingly, Gator's loss is to be calculated as the replacement cost of rebuilding at this "another site," which is still "at the original premises."

As the above language demonstrates, there is simply no requirement in the Policy that Gator must rebuild the building at the same site (i.e., the same spatial location on the ground as before), or that Hartford can limit its payment based on replacement cost of rebuilding at that same spatial location.  The Policy instead allows that the building may be rebuilt at the same "***or another site***" and that the loss will be determined accordingly. As the plain and ordinary language of the Policy provides, such "another site" certainly can be another spatial location for a planned structure to be placed "at the original premises" of 1625-1641 Church Street, Conway, South Carolina 29526.[58]  It cannot be disputed that the planned structure, for which Hartford has refused to pay the full replacement cost, will be located at the "original premises" of 1625-1641 Church Street, Conway, South Carolina 29526.   Thus, Gator respectfully requests that the Court grant it partial summary judgment, and order that Hartford calculate Gator's replacement cost loss to rebuild the Waccamaw Square building at another site on the original premises.

Even if, arguendo, the Court somehow could find that the undefined term "another site" cannot possibly be construed to be a separate spatial location still "at the original premises" of 1625-1641 Church Street, Conway, South Carolina 29526 (which it should not given the plain and ordinary meanings of the terms), Gator would nevertheless be entitled to coverage for the value of the undamaged portion of the building that the City of Conway requires to be placed in a new location on the premises in order to obtain a building permit.  As set forth above, the Hartford Policy clearly provides coverage for the value of undamaged portion of buildings which have been required to be demolished by building, zoning or land use ordinance or law.   This loss

---

[58] See Property Choice Coverage Form PC 00 10 01 03, p. 14;  Webster's Ninth New Collegiate Dictionary, 1991; Continental Cas. Co., 128 Fed. Appx. at 960 (court must apply plain, ordinary meaning of terms utilized in an insurance policy).

CHARLESTON\405394v1

is to be valued on the same basis that applies to the entire building—that is replacement cost.   In order to obtain a building permit, Gator must rebuild the undamaged and damaged portions of the building on another footprint.  As a matter of law, Gator is entitled to the replacement cost of that building, including the undamaged portion.  That undamaged portion includes the full cost of its freight docks, parking lot and underground piping necessary for the replacement of the building.  Such coverage is found under the "Value of Undamaged Buildings" coverage, and it is to be included within the $5,364,931.48 Policy Building limit of insurance.[59]  In the unlikely event that the Court does not find that Gator can rebuild and receive the replacement cost to rebuild "another site" "at the original premises," Gator alternatively respectfully requests that the Court grant partial summary judgment, and properly interpret the Hartford Policy to allow replacement cost coverage for the value of the undamaged portion of the Waccamaw Square building being rebuilt at "another site" "at the original premises."

**D.      Harford's Own Expert Has Calculated That The Full Cost To Relocate  The Waccamaw Square Building To Another Site At The Original Premises To Be $6,447,549.  Based on Hartford's Own Calculations And Admissions, Gator Is Entitled To Receive The Replacement Cost Policy Limit Of $5,364,931.48, Plus The $1,000,000 In "Increased Cost of Construction" Limit.**

As set forth above, Gator may replace the Waccamaw Square building at another site at the original premises of 1625-1641 Church Street, Conway, South Carolina 29526.  In addition to coverage for the cost of replacing the damaged portion of the property at this other site at the original premises, Gator also has purchased coverage for the undamaged portion of the building to be constructed at this other site at the original premises.  These costs include the costs for Gator's freight docks, parking lot construction and underground pipes.  These replacement costs for Gator's undamaged and damaged property are covered and are subject to the admitted policy

---

[59] Property Choice Coverage Form PC 00 10 01 03, p. 8, u. (1).

CHARLESTON\405394v1

limit of $5,364,931.48.   Gator has also purchased an additional $1,000,000 in coverage for "increased costs of construction."

Hartford, however, did not break out and separately calculate the costs for replacing the undamaged portion of the Waccamaw Square building at the other site from the costs to replace the damaged portion of the Waccamaw Square building at this site.   Hartford has also not separately calculated what the original replacement costs are for the undamaged and damaged portions of the Waccamaw Square building, and then compare them to the new building items that are now required by the City of Conway code, so that the specific "*increased* costs of construction" can be calculated.[60]

Rather than performing these critical calculations, Hartford instead assumed a lump sum of the replacement cost per square foot of Waccamaw Square building at the original site only.[61] It also has admitted that the "increased cost of construction" is in excess of $ 1,000,000, without providing calculations of what specific costs are "increased" from original replacement costs due to new items required by the building code.[62]

Harford's expert, Laverne Graham of Watkins Services, however, has recently provided a new calculation for the total cost of replacing the undamaged and damaged portions of the Waccamaw Square building, at its new location in the amount of $4,552,504.98, plus damaged and undamaged parking and site costs and loading dock costs totaling $1,895,045.81.[63]   These amounts sum to $6,447,549, the total replacement cost of the Waccamaw Square building for the

---

[60] See Exhibit CC, 3/10/09 Letter from Christopher Ogiba, at p. 3; Exhibit M, 3/20/09 Letter from John Wilkerson, at p. 3 ("There is no need to breakdown the damages…Since the same replacement cost is being applied to all applicable portions of the building…").   Exhibit M was in response to Exhibit CC, which stated that Gator is still unclear as to the total final amounts Hartford has calculated for the undisputed replacement cost and the amounts Hartford has broken out for damages versus undamaged portions of the building.
[61] See Exhibit U (Dodd Dep.) at p. 58, ll. 10-24 and p. 181, ll. 15-17.
[62] See Exhibit K (Eudy Dep.) at pp. 100-01.
[63] See Exhibit V, Watkins Report, WT Services Report, pp. 039-046.

other site at the original premises.[64]    Even with Mr. Graham's new calculations, Hartford still

has not broken out the undamaged from damaged portions of the Waccamaw Square building,

nor has it provided the specific amount within his $6,447,549 total that comprises "increased cost

of construction"

Based on Hartford's own calculations and admissions, Gator is entitled to receive the full

policy limit of $5,364,931.48.  This amount is clearly _under_ Mr. Graham's replacement cost

calculation of $6,447,549.  Moreover, Hartford itself has admitted that $1,000,000 in coverage is

due and payable to Gator for "increased cost" of construction.[65]    If $1,000,000 is subtracted

from Mr. Graham's replacement cost total of $6,447,549, the resulting amount is still in excess

of the agreed Building Policy limit of $5,364,931.48.    Accordingly, Gator is entitled the

coverage provided by the Policy, and Hartford is bound by its own admissions and calculations.

As a matter of law, Gator is entitled to the Policy limit of   $5,364,931.48, plus the admitted

$1,000,000 in "increased cost of construction" coverage.

> **E.      The Policy Provides A Separate Amount Of Insurance For "Debris Removal," Apart From The $1,000,0000 In "Demolition Costs And Increased Cost of Construction" Coverage and apart from the $5,364,931.48 building limit of insurance coverage.**

The Policy further provides separate and distinct "Debris Removal" Coverage, which is

apart from its additional Ordinance or Law coverage detailed above.   The Property Choice

Coverage Form in the Policy provides as follows, in pertinent part:

> **g.      Debris Removal**
>
> (1)      Subject to Paragraphs (3) and (4) below, _**we will pay your expenses to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period.**_  The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or direct physical damage.

---

[64] Id.

[65] See Exhibit K,(Eudy Dep.) at pp. 100-01.

CHARLESTON\405394v1

(2)    Debris Removal does not apply to costs to:

      (a)    Extract "pollutants or contaminants" from land or water; or

      (b)    Remove, restore or replace polluted or contaminated land or water.

(3)    **Subject to the exceptions in Paragraph (4), the following provisions apply:**

      **(a)    The most we will pay for the total of direct physical loss or direct physical damage plus debris removal expense is the _applicable Limit of Insurance applicable to the Covered Property that has sustained loss or damage_.**

      **(b)    _Subject to (3)(a) above, the amount we will pay for debris removal expense is limited to 25% of the sum of the deductible plus the amount that we pay for direct physical loss or direct physical damage to the Covered Property that has sustained loss or damage_.**

(4)    **We will pay up to an _additional amount_ of insurance as shown in the Property Choice Declarations for debris removal expense, for each premises, in any one occurrence of physical loss or physical damage to Covered Property, if one or both of the following circumstances apply:**

      **(a)    The total of the actual debris removal expense plus the amount we pay for direct physical loss or direct physical damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.**

      **(b)    The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for direct physical loss or direct physical damage to the Covered Property that has sustained loss or damage.**

      **_Therefore, if (4)(a) and/or (4)(b) apply, our total payment for direct physical loss or direct physical damage and debris removal expense may reach but will never exceed the applicable Limit of Insurance on the Covered Property that has sustained loss or damage, plus the applicable Debris Removal Additional Limit Of Insurance as shown in the Property Choice Declarations._**[66]

The Policy's declaration page shows an "additional amount" of $50,000 in Debris Removal coverage.[67]

---

[66] Property Choice Coverage Form PC 00 10 01 03, p. 4 (emphasis added).
[67] See Property Choice- Schedule of Premises and Coverages, Form PC 00 02 01 03T, p. 3.

The Court will note that the removal of debris in the case at bar has in fact been "caused by" or is "resulting from" a "Covered Cause of Loss." It is undisputed that the fire is a "Covered Cause of Loss," and but for the fire, there would not be debris to be removed. Both the damaged and undamaged portions of the property are clearly "Covered Property" under the Policy. There also simply is no "ordinance or law" exclusion in the "Debris Removal" coverage provisions. Rather, Hartford has provided an additional amount of insurance for debris removal, provided that the removal is caused by or resulted from a Covered Cause of Loss to Covered Property. That has occurred here. Accordingly, Gator is entitled collect the amount to remove debris from both the damaged and undamaged portion of the building under the "Debris Removal" coverage in the Property Choice Coverage Form.[68]

Hartford, however, has wrongfully attempted to include an alleged amount for debris removal for the undamaged portion in the "Demolition Costs and Increased Cost of Construction" section of the Ordinance or Law coverage. It has done so without ever obtaining an actual calculation and breakdown of the costs for the amount to remove debris from the undamaged portion, as compared to the damaged portion of the building.[69] In effect, Hartford is trying to lump an estimated (as opposed to actual) debris removal cost for the undamaged portion of the building into the "cost to clear the site" language of the "Demolition Costs and Increased Cost of Construction" coverage, so as to further apply a purported $1,000,000 "sublimit" and to cap Gator's loss.

Hartford again attempts to violate the Policy's terms, so as to limit and cap Gator's recovery. Gator purchased "Debris Removal" coverage for its costs to remove debris of Covered Property, which has either been caused by or resulted by a Covered Loss. Those events

---

[68] See Exhibit V (Watkins Report, WT Services), pp. 039-046.
[69] See Exhibit U (Dodd Dep.) at p. 66, l. 5 – p. 68, l. 21.

CHARLESTON\405394v1

undisputedly have occurred here. Contrary to Hartford's erroneous interpretation that serves to reduce its obligations under the Policy, Gator is entitled to fully recover the "Debris Removal" coverage that it purchased, *plus* the full $1,000,000 in additional coverage for "Demolition Costs and Increased Costs of Construction." Hartford has simply failed to adjust Gator's loss in this proper manner. As a matter of law, Hartford should not be permitted to limit Gator's "Debris Removal" recovery by lumping it into the "Demolition and Increased Cost of Construction" coverage only.[70]

## F.    Hartford Owes "Claim Expense" To Gator As A Matter Of Law.

The Policy provides $50,000 in "Claims Expense" coverage.[71] The Policy provides, in pertinent part:

### e.    Claim Expenses

You may extend the insurance provided by this coverage form to apply to the necessary and reasonable expenses you incur in preparing claim data when we require it. Claim expenses as used in this Additional Coverage means the cost of taking inventories, making appraisals and preparing other documents that we request. The most we will pay in any one occurrence for the preparation of claim data under this Additional Coverage is the applicable limit of insurance shown in the Property Choice Declarations for Claim Expenses.

We will not pay for any expenses incurred, directed or billed by and payable to insurance adjusters or their affiliates or subsidiaries or any costs as provided in or incurred due to the GENERAL CONDITION – Appraisal.[72]

---

[70] As set forth above, in the "Demolition Costs and Increased Cost of Construction" coverage, Hartford promises to provide additional coverage, above and beyond what is provided in the basic Policy. Moreover, any ambiguity in Hartford's Policy is to be construed in favor of coverage. *See*, *e.g.*, Continental Cas. Co., 128 Fed. Appx. at 960. The Court will note that Hartford uses the terms "expenses to ***remove debris*** of Covered Property" in the "Debris Removal" coverage. However, it does ***not*** use such terms in the "Demolition Costs and Increased Cost of Construction" provisions. Rather, there it provides additional coverage for the "cost to clear the site of the undamaged portion of the building," as opposed to the cost to removing ***debris*** from such property. Moreover, the Court will note that, in all events, there is an additional $50,000 in "Debris Removal" coverage above and apart from the $1,000,000 "Demolition Costs and Increased Cost of Construction" coverage, so that if the $1,000,000 of coverage has been exhausted then inclusion of any part of the debris removal costs in said $1,000,000 coverage will deprive the insured of their rightful debris removal coverage up to the $50,000.00 debris removal coverage amount. That is what has occurred here.

[71] Property Choice- Schedule of Premises and Coverages, Form PC 00 02 01 03T, p. 1.

[72] Property Choice Coverage Form PC 00 10 01 03, p. 3, Section A. 4(e) (emphasis added).

CHARLESTON\405394v1

Following Hartford's initial refusal to recognize the Waccamaw Square building as a total loss, it then required and requested Gator to support its claims with additional documentation and proof of its claims.[73]   Hartford was not going to pay additional amounts unless and until Gator provided its own estimates and support for its claims, and it is undisputed that Hartford required and requested that Gator obtain its own estimates and support for replacement of the building destroyed by the fire.  Hartford also appointed counsel and expressly required Gator to deal with that attorney.[74]   Accordingly, Gator was forced to support its legal positions and communicate with Hartford through counsel.   Despite these undisputed facts, Hartford has now refused to make ___*any*___ payment for any Claim Expense incurred by Gator. Hartford's expert, Eudy, testified that he did not even consider claim expenses in his review.[75] While Gator agrees that the amount of such Claim Expense may be a matter to be determined at trial, Gator moves for partial summary judgment and asks the Court to hold that, as a matter of law, Hartford requested and required that Gator prepare claim data and other documents to support its claim, thereby rendering it liable for Claims Expense under the Policy.

G.    **Gator Is Entitled To Its Full Closing Costs On A Replacement Property That Was Selected With Hartford's Express Approval.**

With Hartford's express approval, Gator located a replacement property for the Waccamaw Square building.[76]   This property is located in Flower Mound, Texas.[77]   Gator notified Hartford of this potential purchase, and Hartford insisted that it approve the Flower Mound property has an acceptable replacement to the Waccamaw Square building.[78]   Hartford insisted on this approval, despite the fact that its Policy allowed Gator to "choose to replace your

---

[73] See Exhibit W, 12/3/08 letter from Edward Pritchard, p. 2; Exhibit X, 7/31/09 letter from John Wilkerson, p. 2, fn. 1; Exhibit Y, 8/7/08 e-mail from Kim Dodd.
[74] See Exhibit Z, 1/8/09 e-mail from E. Pritchard.
[75] See Exhibit K (Eudy Dep.) at pp. 93 – 94.
[76] See Exhibit U (Dodd Dep.) at p. 161, ll. 7-12.
[77] Id.
[78] See Exhibit U (Dodd Dep.) at p. 162, ll. 3-12.

CHARLESTON\405394v1

building at another premises."[79]   After receiving Hartford's approval, Gator proceeded to close

on the Flower Mound property, and thereby mitigated Hartford's obligation to make further

payment for Gator's lost rental income.[80]   Hartford's experts have agreed that such action by

Gator reduced the rental income loss that Gator would otherwise incur, had it not replaced the

property with the Flower Mound purchase.[81]   Indeed, had it not replaced the property with the

Flower Mound acquisition, Gator would have incurred at least another twelve to fourteen months

of lost rent as a result of the fire.[82]

     Kim Dodd, Hartford's adjuster for the Waccamaw fire, was designated as Hartford's Rule

30(b)(6) representative, to testify on behalf of the company.   As a corporate representative, Ms.

Dodd was required to testify not on her own behalf, but on behalf of Hartford.   See Rosenruist-

Gestao E Servicos LDA v. Virgin Enterprises Ltd., 511 F.3d 437, 444 (4th Cir. 2007).   The Rule

requires the witness to fully and adequately prepare for the deposition and be capable to testify

about information known or reasonably available to the corporation.   Fed. R. Civ. P. 30(b)(6).   A

corporation "must make a conscientious good-faith endeavor to designate the persons having

knowledge of the matters sought by [the party noticing the deposition] and to prepare those

persons in order that they can answer fully, completely, unevasively, the questions posed . . . as

to the relevant subject matters."   See, e.g., Brazos River Authority v. GE Ionics, Inc., 469 F.3d

416, 433 (5th Cir. 2006) (quoting Bank of New York v. Meridien BIAO Bank Tanzania Ltd., 171

F.R.D. 135, 151 (S.D.N.Y. 1997)) (other citations omitted).   "[T]he duty to present and prepare a

Rule 30(b)(6) designee goes beyond matters personally known to that designee or to matters in

which that designee was personally involved."   Id.   (quoting United States v. Taylor, 166 F.R.D.

---

[79] See Property Choice Coverage Form PC 00 10 01 03, pp. 3, 14.
[80] See Exhibit U (Dodd Dep.) at p. 166, ll. 1-5.
[81] See Exhibit K (Eudy Dep.) at pp. 247-48.
[82] See Exhibit U (Dodd Dep.) at p. 163, ll. 10-16.

356, 361 (M.D.N.C. 1996)).  "The deponent must prepare the designee to the extent matters are reasonably available, whether from documents, past employees, or other sources." Id. (citations omitted).

When asked about Hartford's adjustment and payment of Gator's Flower Mound costs, however, Hartford's corporate representative could not testify how Hartford had prorated and not fully paid the amount of Gator's closing costs for the Flower Mound purchase.  As she testified, ""***I [Hartford] don't know how that prorated number was calculated.***"[83]  The colloquy continued on direct examination:

> Q.    So you, sitting here today you can't, you cannot delineate between what is a covered extra expense in the [Flower Mound] closing costs and what is not?

> A:    ***Correct***.[84]

Hartford has refused to pay for all of Gator's Flower Mound closing costs and expenses, and has attempted after the closing has occurred to allocate only a portion of such costs and expenses as payable under its Policy.[85]  Hartford now asserts that it can allocate the closing costs and expenses by comparing the Flower Mound purchase price with the amount of Gator's loss at the Waccamaw Square Property.[86]  The Policy, however, provides coverage for the extra expense that Gator incurred with respect to the Flower Mound closing, and it provides no provisions that permit Hartford to allocate and reduce the amount payable to Gator in the manner in which it is wrongfully attempting in an after-the-fact fashion.

The Declarations page shows that the Property Choice-Business Interruption form applies to the Waccamaw Square Property, with the limit of insurance included in the blanket special

---

[83] See Exhibit U (Dodd Dep.) at p. 170, ll. 23-24 (emphasis added).
[84] Id. at p. 171, ll. 13-16 (emphasis added).
[85] See Exhibit X, 7/31/09 letter from John Wilkerson.
[86] Id.

Business Income Limit of $13,866.300.[87]   The Property Choice-Special Business Income Coverage Form provides, in pertinent part:

### A.    COVERAGE

We will pay up to the Special Business Income Limit of Insurance stated in the Property Choice Declarations for the actual loss of Business Income you sustain ***and the actual, necessary and reasonable Extra Expense you incur due to the necessary interruption of your business operations during the Period of Restoration due to direct physical loss of or direct physical damage caused by or resulting from a Covered Cause of Loss to property at "Scheduled Premises"***.

* * *

### 1.    Definitions

    b.    Extra Expense

        (1)    Extra Expense coverage is provided at "Scheduled Premises" only if the Property Choice Declarations show that Special Business Income coverage applies at the "Scheduled Premises".

        (2)    ***Extra Expense means the necessary and reasonable additional expenses you incur during the Period of Restoration that exceed the normal expenses that you would have incurred if there had been no direct physical loss or no direct physical damage to property caused by or resulting from a Covered Cause of Loss***.

        ***We will pay Extra Expense (other than the expense to repair or replace property) to***:

            (a)    ***Avoid or minimize the interruption of business and to continue business operations at the insured premises or at temporary locations, including relocation expenses*** and costs to equip and operate a temporary location.

            (b)    Minimize the interruption of business if you cannot continue operating.

* * *

        ***We will also pay Extra Expense*** to repair or ***replace*** property, but only to the extent it reduces the amount of loss that otherwise would have been payable under ***this*** Coverage Form . . . .[88]

---

[87] Property Choice-Schedule of Premises and Coverages, Form PC 00 02 01 03T, pp. 3, 27.

CHARLESTON\405394v1

The closing costs and expenses associated with the Flower Mound purchase are clearly covered as "Extra Expense" under the Hartford Policy. They were undisputedly incurred as the result of a direct physical loss to Covered Property and to replace said property. It is undisputed that they also served to mitigate Hartford's obligation to pay business/rental income loss to Gator.[89]  Hartford's experts also have admitted that if Gator had not replaced the Waccamaw Square Property, it would have incurred at least another 12-14 months of rent loss, which would have exceeded the amount paid for the Flower Mound closing.[90]  Hartford also never advised Gator that it would pay only a portion of the Flower Mound closing costs, but rather agreed that the Flower Mound property was fully acceptable as a comparable replacement property.[91]

Hartford, however, is now attempting to pay only a portion of the closing costs that Gator actually incurred for the Flower Mound property.[92]  For example, although it previously agreed that the Flower Mound property was a comparable replacement to the Waccamaw Square Property, Hartford later attempted to reduce the cost for title insurance to yet another "comparable" property.[93]  Although Gator has provided additional information in response to Mr. Wilkerson's July 31, 2009 letter, Hartford has refused to make any further payment of the Flower Mound closing costs to Gator.[94]  And now, Hartford is asserting that it may allocate and reduce the amount payable for the Flower Mound closing costs and expenses based on the

---

[88]  Property Choice- Special Business Income Coverage Form, PC 00 20 10 03, pp. 1-2 . Section A. b(2) (emphasis added).
[89]  See Exhibit U (Dodd Dep.) at p. 166, ll. 1-5.
[90]  See Exhibit U (Dodd Dep.) at p. 163, ll. 10-16.
[91]  See Exhibit U (Dodd Dep.) at p. 162, ll. 3-12.
[92]  See Exhibit X, 7/31/09 letter from John Wilkerson.
[93]  Id.
[94]  Id.

CHARLESTON\405394v1

purchase price of the Flower Mound property as compared to the Waccamaw Square Property loss.[95]

It is undisputed that Gator incurred closing costs and expenses to purchase the Flower Mound property, and had they not been paid, this property could not be acquired as a replacement for the Waccamaw Square Property. Moreover, as demonstrated above, Hartford, on direct examination in it is own Rule 30(b)(6) deposition, could not state how it was specifically allocating the closing costs so as to not pay the true closing costs and expenses that Gator had incurred. Hartford's expert, Eudy, testified that he is not aware of anything in the Policy that permits an allocation of closing costs and that he was not aware of how Ms. Dodd, in fact, allocated the costs for which Gator was reimbursed.[96] There is absolutely no language in the Policy that permits Hartford, in an after-the-fact fashion, to reallocate and reduce the amount of the closing costs for a replacement property that it approved.[97] There also is no language in the Policy that allows Hartford to reduce its obligation by comparing the purchase price of a replacement property with the amount of the Waccamaw Square Property loss. Rather, the Policy simply requires that the Extra Expense to replace the property reduces the amount that otherwise would be payable under the the Property Choice-Special Business Income Coverage Form. That admittedly has happened. Gator respectfully requests that the Court grant it partial summary judgment on this issue, and order that Hartford may not reallocate and reduce the amount of the actual closing costs based on an allocation method not set forth in the Policy.

---

[95] See Exhibit K (Eudy Dep.) at p. 247, ll. 10-12.

[96] See id. at p. 247-49.

[97] Indeed, by authorizing the purchase of the Flower Mound property as a replacement, Hartford has waived any argument that Gator's closing costs are not fully covered. See, e.g., Janasik v. Fairway Oaks Villas Horizontal Prop. Regime, 307 S.C. 339, 344, 415 S.E.2d 384, 387-88 (1992) (defining a waiver as a voluntary and intentional abandonment or relinquishment of a known right by a party who possessed knowledge of its rights, or of all of the material facts upon which they depended).

CHARLESTON\405394v1

## V.    CONCLUSION

For all of the reasons set forth above and authorities cited herein, Plaintiffs Gator Waccamaw Shopping Center, Ltd. and Gator Development, Inc. respectfully request that the Court grant their Motion for Partial Summary Judgment.

Respectfully submitted,

MOORE & VAN ALLEN PLLC

s/ Trudy H. Robertson
Trudy H. Robertson (Federal ID No. 6211)
Christopher A. Ogiba (Federal ID No. 9042)
Robert Sumner (Federal ID No. 10215)
40 Calhoun Street, Suite 300
Charleston, S.C. 29401-3531
Tel. (843) 579-7066
Fax (843) 579-8749
chrisogiba@mvalaw.com
trudyrobertson@mvalaw.com
robertsumner@mvalaw.com

CHARLESTON, SC

March 19, 2009